M.M. v R.M. (2024 NY Slip Op 50607(U))

[*1]

M.M. v R.M.

2024 NY Slip Op 50607(U)

Decided on May 20, 2024

Supreme Court, Westchester County

Patel, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 20, 2024
Supreme Court, Westchester County

M.M., Plaintiff,

against
R.M., Defendant.

Index No. 61725/2017 

 

Anar Rathod Patel, J.

NOTICE OF RIGHT TO SEEK MODIFICATION OF CHILD SUPPORT ORDER
This decision contains a child support order. The parties are advised that pursuant to the Low Income Support Obligations and Improvement Act of the Laws of 2010, contained in the New York Domestic Relations Law (DRL) §§ 236(B)(7)(d) and 236(B)(9)(b)(2), unless the parties have specifically opted out of subparagraph (2) or (3) below in a validly executed agreement or stipulation, either party has the right to seek a modification of this child support order upon a showing of:
1. a substantial change of circumstances; or
2. that three years have passed since the order was entered, last modified, or adjusted; or
3. there has been a change in either party's gross income by 15% or more since the order was entered, last modified, or adjusted, provided that the reduction in income was involuntary and the party has made diligent attempts to secure employment commensurate with his or her education, ability, and experience.
The parties are further advised that, pursuant to DRL § 236(B)(9)(b(2), child support arrears that have accrued prior to the date of application to annul of modify any prior order or judgment as to child support may not be reduced or annulled.
The parties are before the Court for a determination of Defendant's renewed application [*2]for an order (a) terminating his child support obligation as of August 25, 2023,[FN1]
on the ground that Plaintiff is the monied spouse; (b) awarding Defendant child support pursuant to a 54% (Plaintiff)/ 46% (Defendant) pro rata division of statutory add-ons; and (c) eliminating or reducing Defendant's child support arrears. The Court presided over a hearing on Defendant's application on January 22 and January 23, 2024. Plaintiff was represented by Nicholas F. Cohen, Esq. of Cohen Clair Lans Greifer & Simpson LLP. Defendant was represented by Evan Wiederkehr, Esq. of The Wiederkehr Law Group. The Court heard testimony from the parties as well as Defendant's expert real estate appraiser, John Saluto, of Hudson Property Appraisal Company and registered tax preparer, Guy DiPietro, of Fine, Ciliberti & DiPietro. Each party submitted a Post-Trial Brief and the transcript of the proceedings ("Tr.") on February 26, 2024.

 Relevant Factual and Procedural Background
The parties were married on December 31, 2007, and are the parents of three (3) children: [REDACTED] (born [REDACTED]), [REDACTED] (born [REDACTED]), and [REDACTED] (born [REDACTED]). Plaintiff is 48 years old. Defendant is 53 years old. Plaintiff commenced an action for a divorce pursuant to DRL § 170(7)[FN2]
on August 8, 2017. The issues of grounds for divorce and parenting were resolved by separate stipulations signed on November 17, 2017, and September 26, 2018, respectively. The parties' Custody Agreement provides for a 50/50 residential custody schedule and joint decision making. All remaining issues were tried before the Hon. John P. Colangelo, commencing on November 14, 2018. A Decision After Trial was rendered on March 28, 2019. The Court found Defendant to be the monied spouse and awarded Plaintiff $2,074.46 in monthly child support and $1,000 per month in post-divorce maintenance for one year. The Court allocated the parties' pro rata statutory add-on expenses to child support at 39% (Plaintiff)/61% (Defendant). Plaintiff appealed.
On August 31, 2022, the Appellate Division issued a Decision reversing the Trial Court in part and remitting several issues to the Supreme Court for determination. The Decision reduced Plaintiff's income to $85,000 per year by eliminating $84,000 of income imputed to her by the Trial Court as a result of rental payments made on Plaintiff's behalf by Plaintiff's parents. The Appellate Court stated:
In light of our determination that the annual income attributed to the plaintiff should be reduced to $85,000, the matter must be remitted to the Supreme Court, Westchester County, for a new determination of the amounts to be awarded as maintenance, both pendente lite and postdivorce [sic]. Since the change in imputed income, as well as the change in the amount of maintenance awarded, will affect the parties' pro rata shares of child support, the court, upon remittitur, should also make a new determination of the amounts to be awarded as child support, both pendente lite and postdivorce [sic]. M.M. v R.M., 208 AD3d 863, 867 (2d Dept. 2022).
On July 19, 2023, this Court issued a Decision and Order upon the remittitur in which it re-calculated Defendant's maintenance obligation to Plaintiff for the period of August 8, 2017, through May 31, 2019, and awarded Plaintiff arrears of $28,205.97. Defendant was granted a $12,000 credit for maintenance previously paid, and no additional maintenance was ordered. The Court next re-calculated Defendant's child support obligation and ordered that Defendant pay the sum of $2,993.77 per month to Plaintiff, plus 76% of all statutory add-on expenses to child support commencing on August 1, 2023, continuing on the first day of each month thereafter. The Court awarded Plaintiff child support arrears in the sum of (i) $58,986.76 for the period of August 8, 2017, through May 31, 2019, (ii) $29,974.40 for the period of June 1, 2019, through May 31, 2020, (iii) $56,569.33 for the period of June 1, 2020, through February 28, 2022, and (iv) $44,906.50 for the period of March 1, 2022, through July 1, 2023. The Court ordered that Defendant's child support and maintenance arrears, less the $12,000 credit, is paid in addition to Defendant's regular child support payments in monthly installments of $2,500 commencing on August 1, 2023.
Defendant moved to modify his support obligations on three occasions after the issuance of the Appellate Division's Decision. This Court rejected the first two motions as procedurally defective and premature. After entry of this Court's July 19, 2023 Decision and Order and an Amended Judgment of Divorce, Defendant renewed his second motion for a modification of support. The issues arising out of the renewed motion [FN3]
are the subject of this Decision After Hearing.[FN4]

Defendant's motion seeks a modification of his child support obligations based on an alleged change in Plaintiff's income by 15% or more and the passage of three years from the support obligations imposed by the Amended Judgment of Divorce, retroactive to the date of entry of the original Judgment on May 14, 2019. Defendant premises his request on a theory of imputation of income to Plaintiff as a result of Plaintiff's parents' purchase of a home for Plaintiff and the children and Plaintiff's parents' payment of housing costs and counsel fees on her behalf. 
Plaintiff is a self-employed pediatric registered dietitian. She launched a nutrition consulting company in 2017. Plaintiff's most recent income tax return (2022) shows $71,191 in gross income and adjusted gross income of $45,420.[FN5]
Defendant was employed as a Managing Vice President of Global Sales Strategy and Operations at [REDACTED], a research and advisory company, until January 2024. Defendant anticipates moving to a new position at [REDACTED] imminently. Defendant's 2023 year-end pay stub reflected total employment income of $435,930.73.[FN6]

 Trial Proceedings
Defendant's Testimony
Defendant testified he is in a position of "financial peril" as a result of the divorce litigation.[FN7]
Defendant stated he has virtually no liquidity and has borrowed $172,789 in multiple loans from his family. Defendant executed promissory notes for the amounts borrowed.[FN8]
The interest rate on the loans is three percent. Defendant currently makes "good faith payments" of $100 per month per loan against the indebtedness; his family agreed to defer the repayment of principal and interest while the divorce litigation is ongoing.[FN9]
Further, Defendant recently took a loan against his 401(k) to meet his monthly expenses. Defendant also testified he has run out of cash [FN10]
and is behind on his payment of legal fees. Defendant testified he does not earn enough money to continue to cover his support obligations and legal fees.[FN11]

Defendant contends the litigation has been driven by Plaintiff's family's animus towards him and their desire to "teach [Defendant] a lesson,"[FN12]
even though his income could never support Plaintiff's lifestyle. Defendant continues to rent the former marital residence for himself and the children at $6,000 per month. The home is flanked by sandbags to limit flooding. Defendant's bedroom is in a converted attic space and he shares a bathroom with the parties' youngest child. Defendant testified he remains in the home to minimize disruption to the children's lives and to facilitate the parties' shared custodial arrangement.
Defendant currently pays approximately $5,500 per month in support, including retroactive payments of $2,500 per month pursuant to this Court's July 19, 2023 Decision and Order.[FN13]
He operates with an approximate $36,000 annual shortfall.[FN14]
If Defendant is not awarded relief from his support obligations, he testified that he will be forced to terminate the services of the parties' shared nanny and relocate to a new home, to the detriment of the children.[FN15]
 He testified that:
I live in fear now that given my financial situation, I can't afford the nanny. The housing [*3]is the next thing that needs to go. I will move into different housing in a different town where the girls cannot go back and forth between the houses as easily as they can now. My fear is this is about custody and maybe always has been and I'm now — now have a renewed fear like I did for that entire year [of custody litigation] that I might lose my children.[FN16]
Defendant admitted that he travels to Florida with the children several times per year to visit his parents and continues to contribute to his 401(k)[FN17]
to the maximum extent permitted.[FN18]
Defendant has a Roth IRA of approximately $15,000 and restricted stock units of approximately $45,000. Defendant has no other savings and is $180,000 in debt for legal fees.[FN19]

Defendant argues that although he earns "significantly more" income than Plaintiff, he should not be required to pay child support because:
. . . under the facts and circumstances of how we are both living our lives, I'm just trying to provide some semblance of a decent lifestyle for my children relative to the lifestyle when they are with [Plaintiff]. I'm not seeking parity. I'm not asking that hey, somebody help me take the kids out of the country on trips and go skiing. I am not asking for anything. I'm just asking to be able to provide a decent lifestyle. In comparison, so my house is one-third the size and I deal with flooding. I shop at Stop & Shop for my groceries. I have far less child care than [Plaintiff] has. She has the nanny until 7:00 p.m. every night to do cooking and get the kids' stuff and whatever, I don't know what happens over there. I won't speculate, but I know it's ten, twenty more hours a week or a month. I'm not asking for that, but I think having a house that's a third the size that floods, taking a couple of trips a year to visit grandparents, spending no money on myself, I have not taken them out of the country nor have I taken a single trip for myself since the divorce started. I haven't been to the Bahamas or anywhere else, but I'm not asking for that. I'm just asking to be left alone so that I can provide for my children and not have to give [Plaintiff] money to increase the lifestyle that she's living when I'm just trying to provide for the children.[FN20]

When asked his opinion as to whether his payment of child support impacts the Plaintiff's ability to care for the children, Defendant testified that:
She has lived this way since the start when I wasn't paying. She lived this way when it was $2,000. She increased the lifestyle when it was $2,000, when [her parents] bought [*4]her the house and, by the way, I am not bitter about this. I am appreciative of everything the girls get over there. I'm just asking to be able to provide for the children when they are with me half the time, but my understanding, to your question, is it hadn't had any impact. When it was nothing, it was similar. When it was $2,000, it was similar and when it's $5,000, it was similar. My best guess is, wherever this goes, whether they spend another million dollars on legal fees, we end up at zero support or we stay where we are, it will  going forward, it will also have no impact.[FN21]
Defendant testified that he cannot continue to meet his financial obligations under the present circumstances, and that "unless I start making changes like tomorrow, I'm in trouble, but maybe a couple of months before I'm out of money."[FN22]

On cross-examination, Plaintiff's counsel established that Defendant graduated summa cum laude from Dartmouth College with a double major, and cum laude from Harvard Law School; he worked at the law firm of [REDACTED] upon graduation. Defendant admitted his income has increased in the past four years from $286,000 to approximately $436,000.[FN23]
Defendant stated that while there is "no fat in the budget," he continues to pay $3,300 in annual membership dues for the SoHo House, a members-only club, in the event he decides to return to a career in film. Defendant testified that his membership "could be instrumental. I used to be . . . in the film business, as you know, writer, producer. It's a place where you go to meet actors, writers, directors, if you want to get business going, rather than grabbing a coffee at a Starbucks." Defendant admitted that the SoHo House membership has never led to income, despite his return to writing and "pitching stuff" during the pandemic.[FN24]

Defendant's 2018 Statement of Net Worth ("SNW") contained a disclaimer that "many of these expenses [listed], are discretionary and may not be able to be sustained going forward." On cross-examination, he acknowledged that he has maintained each of the enumerated expenses including, inter alia, multiple trips to Florida per year, a Rye Golf Club membership, a membership to Equinox fitness club, and a Rye parking pass "in case" he gets a job in the city.[FN25]

Defendant acknowledged his refusal to contribute to the cost of the children's cell phones. He testified that his attorney advised him there is no need for him to contribute to "basic necessities for the children."[FN26]
Defendant also admitted that while he agrees with Plaintiff that the parties' daughter, [REDACTED], suffers from anxiety and could benefit from therapy, he refused to contribute to the expense of her treatment because Plaintiff selected an out-of-network [*5]provider.[FN27]
Defendant has not undertaken any efforts to find a therapist in-network.[FN28]

Defendant testified that his employment at [REDACTED] would be ending in January 2024, and that he anticipates transitioning into another role at the company. He admitted that he was not looking to return to a career in the financial services industry although his income was higher in that position, because he is six years out of date in the field.[FN29]
Defendant acknowledged that he would "do whatever I have to do to put food on the table and a roof over the heads of my girls, period. If I have to go work at McDonald's for some reason because I'm in between jobs, that's what I will do."[FN30]

Testimony of John Saluto, Certified Real Estate Appraiser
Defendant called John Saluto, a Certified Real Estate Appraiser and owner of Hudson Property Appraisal Company, to testify on his behalf. Plaintiff conceded Mr. Saluto is an expert in the area of real estate appraisals in the State of New York.[FN31]
Mr. Saluto testified that he has performed approximately 33,000 residential real estate appraisals over the course of his career and has appeared as an expert real estate appraiser in Court on thousands of occasions. Mr. Saluto has appeared in New York Supreme Courts on more than one hundred occasions and has been appointed by the Court as a neutral real estate appraiser several thousand times.[FN32]

Mr. Saluto testified he was retained by Defendant to provide his expert opinion of the monthly fair rental value of Plaintiff's residence in Rye, New York. He did not physically inspect the property because he could not gain access. Mr. Saluto believes that the failure to physically inspect the premises had no impact on the validity of his opinion. Rather, Mr. Saluto assumed that the property was in similar condition as depicted in the photographs of the home on the Multiple Listing Service ("MLS").[FN33]
Mr. Saluto compared Plaintiff's home with three comparable rental homes in the neighborhood, adjusting minimally for square footage and bath count.[FN34]
Mr. Saluto opined that the fair market rental value of Plaintiff's home is $13,000 per month.[FN35]

On cross-examination, Plaintiff's counsel endeavored to establish that due to the lack of a physical examination of the premises, Mr. Saluto has no firsthand knowledge of the accuracy of the representations on the MLS website. Mr. Saluto acknowledged that the condition of the interior of a home would be relevant to a prospective renter, to a certain degree.[FN36]
He admitted that he did not inspect the interiors of the comparable homes; however, Mr. Saluto explained that brokers routinely rely on the MLS for information in formulating their opinions.[FN37]
When challenged on cross-examination, Mr. Saluto confirmed his professional opinion that the correct fair market rental value of Plaintiff's home is $13,000 per month.[FN38]

Testimony of Guy DiPietro, Registered Tax Return Preparer
Mr. DiPietro was hired by Defendant to review Plaintiff's 2022 income tax return to determine the amount of annual earnings required to satisfy $13,000 per month in rent and $11,000 per month in living expenses ($288,000 annually).[FN39]
Plaintiff's counsel conceded Mr. DiPietro is an expert in the field of accounting and tax return preparation.[FN40]

Mr. DiPietro testified that a person would need to earn approximately $520,000 annually as an employee to yield net income of $288,000.[FN41]
If the person is self-employed, he stated that "in order to net [$288,000], you would have to gross substantially more than $520,000 because a self-employed individual person has to pay their own Social Security tax, whereby if you are an employee, the employer pays half of that tax."[FN42]
On cross-examination, Mr. DiPietro acknowledged that if Plaintiff's expenses were lower than the $11,000 per month used in his calculations, the income required to meet those expenses also would be lower.
Plaintiff's Testimony
Plaintiff was first called as a witness by Defendant on his case-in-chief. Plaintiff acknowledged that her father paid $178,000 in legal fees on her behalf in 2023.[FN43]
Plaintiff's understanding is that her parents wish to be re-paid.[FN44]
Plaintiff's parents paid her first attorney approximately $430,000 in legal fees prior to the entry of a Judgment of Divorce. Since the [*6]entry of the Judgment, they have paid an additional $310,000 in legal fees. Plaintiff has not repaid her parents for any of the $740,000 in legal fees; there are no promissory notes evidencing loans.[FN45]
When asked if she intended to re-pay her parents, she said "I would like to pay back any amount that I can" "but right now, I don't have the funds to be able to pay them back."[FN46]

In a conversation with Defendant on or about October 31, 2023, Plaintiff recalled telling Defendant that Plaintiff's parents are outraged at his position that he should not pay child support. She did not recall telling Defendant that her father and brother were going to "teach him a lesson."[FN47]
Plaintiff testified that her family's financial support was necessitated by Defendant's failure to pay adequate support. Plaintiff testified that the support she receives from Defendant is essential with regard to her payment of essential expenses each month.[FN48]
She stated that she is capable of paying monthly expenses of $8,500, but her actual monthly expenses are $12,141, leaving a significant shortfall. Plaintiff's parents assist with the shortfall and also contribute to the cost of major repairs on her home.[FN49]

Plaintiff's prior home was leased by her father for $7,000 per month with an option to buy at $1,395,000.[FN50]
Plaintiff did not to exercise the option to purchase the home. Rather, Plaintiff selected a home on [REDACTED], close to Defendant and the children's schools, despite knowing the home was unaffordable to her. Plaintiff's family established the [REDACTED] Trust to pay for her new home.[FN51]
The property cost approximately $2,200,000.[FN52]
Plaintiff testified that she never expected Defendant's support obligations to sustain her new home and that the decision to have her parents purchase it was made without regard to Defendant's support payments.[FN53]
At the time of the purchase, Plaintiff was unclear as to her responsibility with respect to payment of the carrying costs of the home (i.e., whether Plaintiff or Plaintiffs' parents would cover the carrying costs of the home), but she nonetheless committed to the move. Plaintiff's parents pay the annual real estate taxes of $28,939.93 and the homeowner's insurance, inter alia.[FN54]

In response to Plaintiff's claim that she is living "hand to mouth,"[FN55]
Plaintiff was questioned about certain purchases made during the litigation. Plaintiff testified that she purchased a secondhand Peloton bike for a nominal sum, a new Pilates Reformer for approximately $5,000, a trampoline for $2,500, and a vacuum for more than $1,500.[FN56]
Of the $121,000 of childcare expenses Plaintiff claimed she incurred in 2022 and 2023, she testified that her parents contributed $38,000. Plaintiff testified that her parents assisted her in paying for $53,615 in after-school enrichment programs and activities for the children.[FN57]

Plaintiff affirmed her representations regarding the expenses listed on her latest SNW, but disputes that she lives in a ten-room house at no cost. Rather, Plaintiff contends that she pays for the utilities, leaf removal, and cleaning supplies for the home.[FN58]
With respect to her income as reported on her SNW, Plaintiff admitted that she cannot identify the source of $14,000 of income distributions on her 2022 income tax return, is unaware if she is the beneficiary of a trust, and does not know whether she benefits from a pension or an inherited IRA.[FN59]

Plaintiff's counsel deferred cross-examination of Plaintiff to her case-in-chief. Plaintiff testified that she separated from Defendant in 2018, and moved from the marital residence to a rental home paid for by her parents in close proximity to Defendant's home and the children's schools. In 2021, Plaintiff moved to the [REDACTED] home.[FN60]
The home has a bedroom for each of the children and two shared bathrooms. There is a small yard in the back, a driveway, and a finished basement. The house experiences flooding, and mold remediation was required after a storm in 2021. The residence is within walking distance to Defendant's home. The neighborhood is quiet and safe, and is located in proximity to a park and the family's church. Plaintiff testified that the area schools are excellent.[FN61]

The parties share joint physical custody of the children on a 2-2-3 schedule. The nanny has been with the family for ten years. She drives the children to their activities and facilitates carpools. She works for Plaintiff from 7:30 a.m. to 7:00 p.m. on weekdays and rarely works on weekends. Plaintiff intends to pay the nanny for two weeks of vacation time during the summer of 2024, and during the holiday break from school. Plaintiff further intends to give her a Christmas bonus.[FN62]

Plaintiff testified that the parties' daughter, [REDACTED], has suffered from anxiety for [*7]two or three years, and that it resolved temporarily after undergoing counseling at school. The child's anxiety resurfaced in the Fall of 2023. Plaintiff found a therapist to provide Eye Movement Desensitization and Reprocessing (EMDR) therapy, as recommended. Defendant refused to contribute to the cost of the child's therapy unless Plaintiff used an in-network provider, despite Plaintiff explaining to Defendant that abrupt cessation of EMDR therapy can be detrimental.[FN63]

Plaintiff is a pediatric registered dietician with a master's degree in clinical nutrition. As part of her training, she completed an internship at the [REDACTED] Hospital, took courses with the Food Allergy Research & Education Organization, and passed a board certification exam to become licensed in the States of New York and Connecticut in 2010. She then accepted a job at the [REDACTED] Hospital in weight management where she stayed for about a year. The parties relocated to Westport because of Defendant's employment and Plaintiff became a full-time caregiver for the children until she accepted a part-time position at [REDACTED] as a nutrition consultant in 2015.[FN64]

In 2017, Plaintiff launched a nutrition consulting company. Plaintiff testified that her business income is derived from four revenue streams: (i) a private practice providing one-on-one nutritional counseling; (ii) speaking engagements as a nutritional expert; (iii) social media partnerships with brands and educational campaigns; and (iv) web advertising.[FN65]
She has not been as successful as she had hoped.[FN66]
Plaintiff testified that she is concerned about her financial future and providing for the children, especially with respect to their college educations.[FN67]
She has curtailed her expenses and become more resourceful since the Judgment of Divorce was entered.
Plaintiff testified that she has been unable to provide the children with "the same quality of life and opportunities and experiences that they had" during the marriage. Plaintiff's family helped her initially with the payment of rent and some of the children's activities, but she describes her relationship with her parents with respect to money as complicated and uncomfortable. Plaintiff testified that she started working harder in her business and used zero percent APR credit incentives to afford basic necessities for the children. Some of the children's expenses were paid using money from 529 accounts established for them by the Defendant's parents. Plaintiff paid the income tax on the withdrawal of those funds. Despite the passage of time, Plaintiff acknowledged that her most recent SNW contains reduced amounts from previous versions for various items. For example, in May 2018, Plaintiff represented that it cost $1,240 per month for food and dining out, but in 2024 she reduced the number to $791 per month. [*8]Similarly, the cost of clothing and dry cleaning was reduced from $635 to $230 per month.[FN68]

Plaintiff testified that her financial situation has improved since this Court's Decision and Order on the remittitur from the Appellate Division, but that she still struggles. Plaintiff's parents have continued to pay for the costs of her home including the real estate taxes and homeowner's insurance; they also contribute to the costs of certain of the children's extra-curricular activities, such as music lessons.[FN69]

On cross-examination, Plaintiff admitted she has been building her business for seven years and that she netted approximately $71,000 in 2022. Plaintiff acknowledged that her father is outraged by the litigation and believes Defendant does not pay sufficient support. Plaintiff denied that her father plays a role in the litigation strategy, but admitted she speaks to him about the issues. Plaintiff acknowledged that, but for her parents' payment of at least $760,000 [FN70]
in counsel fees on her behalf, she would not have been able to afford the litigation.

 Legal Analysis
Defendant seeks an order imputing income to Plaintiff based upon recurring financial support from her family and determining that she is the monied spouse for child support purposes. Alternatively, Defendant seeks an order terminating his obligation to pay child support on the ground that such payments are unjust and inappropriate under the circumstances. He further seeks an order vacating all support arrears as set forth in this Court's July 19, 2023 Decision and Order.
The Court's determination of Defendant's motion for the elimination of his child support obligations requires a review of the Child Support Standards Act (hereafter "CSSA") as codified in the Domestic Relations Law. The CSSA sets forth a three-step method for determining the appropriate amount of support and each parent's respective share of the child support obligation. See DRL§240[1-b][c]; Family Court Act §413[1][c]; Kaufman v. Kaufman, 189 AD3d 31 (2d Dept. 2020). Where, as here, the combined parental income exceeds the statutory baseline, the court may apply the statutory percentage to all or part of the income over the baseline or it may consider the statutory factors to determine what, if any, additional child support should be awarded. However, there must be "some . . . articulation of the reasons for the court's choice . . . to facilitate . . . review." Matter of Cassano v. Cassano, 85 NY2d 649, 655 (1995); see Matter of Pittman v. Williams, 127 AD3d 755, 756 (2d Dept. 2015); Finke v. Finke, 15 AD3d 615, 618 (2d Dept. 2005). The court's decision "should reflect a careful consideration of the stated basis for its exercise of discretion, the parties' circumstances, and its reasoning why there [should or] should not be a departure from the prescribed percentage." McCoy v. McCoy, 107 AD3d 857, 858 (2d Dept. 2013), quoting Wagner v. Dunetz, 299 AD2d 347, 350—351 (2d Dept. 2002). "In addition to providing [its reasons] for deviating or not deviating from the statutory formula, a [*9]court must relate [its analysis] to the statutory factors." Matter of Pittman v. Williams, 127 AD3d at 757 (emphasis omitted), quoting Matter of Gluckman v. Qua, 253 AD2d 267, 270—271 (2d Dept. 1999).
Imputation of Income
"A court has broad discretion to impute income when determining the amount of child support and is not bound by the parties' representations of their finances." Pilkington v. Pilkington, 185 AD3d 844, 846 (2d Dept. 2020), citing Nerayoff v. Rokhsar, 168 AD3d. 1071, 1077 (2d Dept. 2019); Steinberg v. Steinberg, 59 AD3d 702, 705 (2d Dept. 2009). "The court may impute income based on the parent's employment history, future earning capacity, educational background, or money received from friends and relatives. Pilkington, 185 AD3d at 846, citing Matter of Ambrose v. Felice, 45 AD3d 581, 583 (2d Dept. 2019). "Where a party's account is not believable, the court may impute a true or potential income higher than alleged." Wesche v. Wesche, 77 AD3d 921, 923 (2d Dept. 2010); see also, Duffy v. Duffy, 84 AD3d 1151, 1151—1152 (2d Dept. 2011). "[T]he court's credibility determinations are accorded deference on appeal." Matter of Monti v. DiBedendetto, 151 AD3d 864, 866 (2d Dept. 2017); see Matter of Kiernan v. Martin, 108 AD3d 767, 768 (2d Dept. 2013) cited in Tuchman v. Tuchman, 201 AD3d 986 (2d Dept. 2022). The court's decision must detail the "source of the imputed income, the reasons for such imputation and the resultant calculations." Pilkington, 185 AD3d at 846; see Muldowney-Walsh v. Desroches, 167 AD3d 1022, 1024 (2d Dept. 2018); Rosenberg v. Rosenberg, 44 AD3d 1022, 1025 (2d Dept. 2007). Where parents share custody equally and neither parent can be said to have physical custody of the children for a majority of the time, the parent having the higher income and thus bearing the greater pro rata share of the child support obligation, is deemed the noncustodial parent for child support purposes. Matter of Smisek v. DeSantis, 209 AD3d 142, 151—152 (2d Dept. 2022); see Baraby v. Baraby, 250 AD2d 201, 204 (3d Dept. 1998).
Here, the parties equally share physical and legal custody of the children. The Trial Court (Colangelo, J.) deemed Defendant the noncustodial parent for child support purposes based upon his then-earnings of $270,000 and Plaintiff's imputed income of $169,000, which was reduced to $85,000 on appeal.[FN71]
 Currently, Defendant earns $435,930.73 in gross income; Plaintiff's last filed tax return reflected gross business income of $71,191; Plaintiff receives approximately $3,000 per month in child support, and $2,500 in monthly arrears arising from this Court's re-calculations of support upon remittitur by the Appellate Division. 
Defendant now seeks the complete elimination of his obligation to pay child support either by an order declaring Plaintiff to be the monied spouse for child support purposes, or because his current child support obligation is unjust and inappropriate. Each party testified at trial in support of or against Defendant's motion to eliminate Defendant's financial obligations. At best, the parties' testimony regarding their respective financial conditions strained credulity; at worst, it bordered on fiction. Defendant, who earned almost $436,000 in 2023, testified he is in "financial peril" and that he will run out of money in a few months if relief from his child support obligations is not ordered by this Court. Notwithstanding this claim, Defendant confirmed that he maintains an expensive membership at the SoHo Club in New York City to [*10]support a latent film career, travels to Florida with the children several times per year, contributes the maximum annual amount to his 401(k), pays for a parking permit in Rye in case he returns to work in New York City, and maintains memberships at the Rye Golf Club and the Equinox gym. Not to be outdone by Defendant's hyperbole, Plaintiff testified she lives "hand to mouth" while residing rent-free in a $2.2 million dollar home paid for by her parents. Additionally, Plaintiff enjoys the services of a full-time nanny during her parenting time from before school to after dinner. Plaintiff, with the support of her parents, spends exorbitant sums on after-school enrichment programs and various activities for the children. Instead of supplementing her income with additional employment, Plaintiff continues to work full time in her business which, by her own testimony, has failed to grow as expected over the past seven years.
Defendant seeks the imputation of considerable income to Plaintiff based upon her family's continued financial support. He argues that Plaintiff should not be permitted to hide behind statutory calculations using income reported for tax purposes to avoid judicial consideration of the parties' true financial condition. Defendant points to the well-settled principle of law that "[t]he court may deviate from the [CSSA] formula used to determine a non-custodial parent's basic child support obligation when strict application of the guidelines will produce unjust or inappropriate results." Cody v. Evans-Cody, 291 AD2d 27, 30 (2d Dept. 2001). Accordingly, Defendant seeks an order imputing income to Plaintiff based upon the totality of her financial resources, including the "grossed-up" income needed to cover the after-tax fair rental value of her home and monthly expenses as set forth in her 2022 SNW. Defendant further seeks to impute income to Plaintiff on account of the counsel fees paid on her behalf by her parents.
Rental Income
Defendant first seeks to impute income to Plaintiff based on the fair market rental value of her home, which was purchased for Plaintiff by her parents. Plaintiff opposes the request, and argues that the imputation of rental income based upon housing payments by her parents is contrary to the law of the case established by the Appellate Division's Decision. This Court disagrees. In its Decision, the Appellate Division reversed the Trial Court's imputation of $84,000 of rental payments by Plaintiff's parents as income to Plaintiff, and held as follows:
In this case, the Supreme Court properly imputed annual income of $85,000 to the plaintiff based upon the offer of a full-time job from her employer. However, imputing an additional $84,000 in annual income to the plaintiff, based upon the fact that her father paid her rent so she could live separate and apart from the defendant during the pendency of this action, was improvident exercise of discretion. This gift was made by the plaintiff's father after the action was commenced and was at least in part a response to the fact that the defendant was not making any pendente lite support payments. Moreover, the term of the lease for the plaintiff's residence was only 19 months, commencing on December 1, 2017. The plaintiff's father had no legal obligation to provide his daughter with housing, and there was no indication in the record that his payment of rent would continue once the 19-month lease period ended. Under these circumstances, it was not appropriate to impute the rental payments made by the plaintiff's father as income to the [*11]plaintiff. M.M. v R.M., 208 AD3d 863, 865—866 (2d Dept. 2022) (internal citations omitted).
The Decision does not hold that rental income could never be imputed to Plaintiff. Instead, it is limited by the trial record, which evidenced that Plaintiff's parents made rental payments on her behalf for a lease that commenced on December 1, 2017 and ended on July 1, 2019. The trial record concluded on December 10, 2018. The Appellate Division did not and could not have known that Plaintiff's parents would continue to pay her housing expenses for more than five years after the trial.
An appellate court's resolution of an issue on a prior appeal constitutes law of the case and forecloses re-examination thereof, absent a showing of subsequent evidence or a change in the law. Kenny v. City of New York, 74 AD3d 630, 630—631 (2d Dept. 2010); See Sicuranza v. McDonald, 102 AD3d 762 (2d Dept. 2013); see also, Jmar Service Center, Inc. v. Mahoney, Connor & Hussey, et al, 45 AD3d 809 (2d Dept. 2007). Here, the evidence adduced at trial demonstrates not only that the financial contributions from Plaintiff's parents continued after the initial divorce trial, but increased thereafter. Plaintiff's parents continued to pay her rent and living expenses until June 28, 2021, when they formed a trust to purchase Plaintiff a home for $2,200,000 without a mortgage. Virtually all expenses related to the home are paid for by the trust as substantiated by Plaintiff's testimony and 2022 SNW.[FN72]
Under these circumstances, the imputation of income to Plaintiff is appropriate, because she will receive a continuing financial benefit from residing in her new home rent-free, and from her parents' payment of expenses for the children and Plaintiff's counsel fees.
New York Courts have held that "[i]t is proper for the court to impute income to a party based on the value of a rent-free home provided for him or her by a relative." P.C. v. K.K., 30 Misc 3d 1211(A) (Sup. Ct. Kings Cty. 2011); see Matter of Remsen v. Remsen, 198 AD3d 658 (2d Dept. 2021) (Support Magistrate providently exercised discretion by imputing income to mother for housing costs paid by her brother-in-law); Baffi v. Baffi, 24 AD3d 578 (2d Dept. 2005). Here, Mr. Saluto opined that the fair market rental value of Plaintiff's home is $13,000 per month, or $156,000 per year. Although Mr. Saluto's opinion was uncontroverted on cross-examination, Plaintiff's counsel argues that the rental value of the home should not be imputed to Plaintiff because housing options were limited when Plaintiff moved out of her prior home.[FN73]
This argument is unconvincing. Even if the availability of alternate housing was relevant to the issue of imputation of income, Plaintiff failed to offer evidence of the housing options in Rye at the time her parents purchased her current home.
Plaintiff further argues that the Court is prohibited from imputing income to Plaintiff as a result of her parents' financial contributions because Defendant is in arrears of his support obligations. This Court disagrees. Relying on decisions from the First and Third Departments, Plaintiff cites to instances where the court declined to impute income to a party as a result of financial contributions from family members where the party's spouse refused to pay pendente lite support during the pendency of divorce litigation and there was no indication in the record that the gifts would continue post-divorce. See Isaacs v. Isaacs, 246 AD2d 428 (1st Dept. 1998); [*12]Noble v. Noble, 78 AD3d 1386, 1388—89 (3d Dept. 2010). These cases are inapplicable here as there is evidence of Plaintiff's parents' continued financial support of Plaintiff post-divorce.
Upon consideration of the foregoing, this Court will impute to Plaintiff additional income representing the fair market rental value of her home. The Court credits the testimony of real estate expert, John Saluto, and finds that the annual fair market rental value of Plaintiff's home is $156,000. The Court declines Defendant's invitation to "gross-up" this amount to account for income taxes Plaintiff would have to pay if the imputed income were subject to tax. Defendant failed to cite a basis in law for this position. To the contrary, relevant case law looks only to the cash value of the financial assistance received, without adjustment. See, e.g., Matter of Poulos v. Chachere, 163 AD3d 679 (2d Dept. 2018); O'Brien v. O'Brien, 163 AD3d 694 (2d Dept. 2018); Wesche v. Wesche, 77 AD3d 921 (2d Dept. 2010); Matter of Nannan L. v. Stephen L., 191 AD3d 533 (1st Dept. 2001). In these cases, the court imputed the value of the financial assistance to the parent for purposes of calculating child support; the court did not increase the imputed amounts to account for income taxes, which never were assessed.
Imputed Income Based on Expenses
Defendant next argues that the Court should impute income to Plaintiff based upon her expenses in excess of her reported income as indicated on her 2022 SNW, citing Khaimova v. Mosheyev, 57 AD3d 737 (2d Dept. 2008) (affirming the trial court's imputation of income to the defendant where his financial documentation indicated that his monthly income was only one sixth of his stated monthly expenses and no evidence was submitted to show that the expenses were not being paid timely). Defendant argues that income must be imputed to Plaintiff because her reported gross income in 2022 was approximately $71,000, while her 2022 SNW evidences expenses of $134,000 per year, exclusive of the cost of maintaining her home. Defendant submits that the expenses claimed on Plaintiff's 2022 SNW are the most accurate, as her subsequent submissions reveal what he believes to be an incredible decrease in Plaintiff's annual expenses. The Court rejects this argument. Defendant's counsel failed to establish through testimony or documentary evidence that Plaintiff inaccurately reported her expenses after her 2022 SNW, or that income should be imputed to her as a result of any alleged discrepancy. Plaintiff credibly testified that she relies on the support received from Defendant and on assistance from her parents in meeting her financial obligations and that she has intentionally reduced her expenses in recent months.
Imputed Income Based on Counsel Fees
Defendant next seeks an order imputing income to Plaintiff based upon the counsel fees paid on her behalf by her parents. Defendant argues Plaintiff's parents have paid her counsel fees in a "systematic, regular, provable and quantifiable way" over the course of the litigation. He submits that "reason dictates" that Plaintiff's parents will continue to provide her with counsel fees going forward. Defendant contends Plaintiff's parents have paid not less than $903,000 in connection with the fees for Plaintiff's divorce, and that they paid $178,000 in 2023 alone. Defendant's counsel submits that Plaintiff would need to earn an additional $321,000 in gross, pre-tax income to cover the cost of her legal fees in 2023. Plaintiff opposes the application. Plaintiff argues that the imputation of income as a result of counsel fees paid by a [*13]third party is a baseless theory manufactured by Defendant and without legal support. The Court agrees.
There is no appellate authority which justifies imputing counsel fee payments by a third party as income to a parent for the purpose of calculating child support. While Defendant's counsel cites to the case of Lugo v. Torres as precedent for his argument that the value of legal fees paid by a third party should properly be imputed as income to a parent for child support purposes, this Court disagrees with counsel's expansive interpretation of the holding there. 174 AD3d 595 (2d Dept. 2019). In Lugo, a matrimonial action, plaintiff appealed from the order of the Supreme Court, Westchester County IDV Part (Capeci, J.). The order, after a hearing, granted the defendant's motion to hold the plaintiff in civil contempt for his failure to comply with an order of the same court requiring him to pay the defendant's counsel fees in the sum of $193,549 within thirty days of the date of the order. On appeal, the Appellate Division upheld the contempt citation against Plaintiff and stated that "[u]nder the unusual circumstances presented . . . we decline to disturb the Supreme Court's rejection of the plaintiff's proffered defense of inability to pay the outstanding arrears due under the court's prior order entered April 13, 2018." Lugo, 174 AD3d at 596—597; see Nederlander v. Nederlander, 102 AD3d 416, 417 (2d Dept. 2013). The plain language of the Lugo decision acknowledges that its holding is limited to the "unusual circumstances presented" and is not intended to be applied universally. Lugo, 174 AD3d at 596. Instead, the Second Department merely "decline[d] to disturb the Supreme Court's . . . " ruling with respect to the credibility of plaintiff's defense of an inability to pay in response to a contempt citation. Id. at 597.
Despite the lack of appellate authority directly on point, the analysis of whether or not income should be imputed to a litigant for child support calculation purposes where a third party pays substantial counsel fees on behalf of the litigant must begin with the statutory provision regarding imputation. To that end, DRL §240(1-b)(b)(5)(iv)(D) permits judicial discretion to attribute and/or impute income to a party on the basis of recurring "money, goods, or services provided by relatives and friends." See Matter of Simmons v. Simmons, 48 AD3d 691, 692 (2d Dept. 2008) (citations omitted); Abellard v. Aime, 18 AD3d 653 (2d Dept. 2005) (holding that the court properly considered the assistance petitioner received from his father in calculating his child support obligation by imputing the loans that he received from his father as income); Miller v. Miller, 18 AD3d 629, 631 (2d Dept. 2005) (holding that the court should have considered the assistance the plaintiff received from her mother when calculating her child support obligation for the son); Matter of Yaroshenko v. Kats, 7 AD3d 806 (2d Dept. 2004) (holding that the Court properly imputed loans that the father received from his mother as income); Mellen v. Mellen, 260 AD2d 609, 610 (2d Dept. 1999) (holding that it was proper for the court to consider sums of money which the husband received from his parents as income for purposes of determining the amount of his support obligation).
In determining whether to impute financial contributions from a third party as income to a parent for the purpose of calculating child support, the continuing, reliable nature of the financial assistance is of paramount importance. For example, in Jennifer D. v. Maurice D., Justice Sunshine warned against imposing an unjust result by conflating the imputation of ongoing financial compensation from a family business with the imputation of passive lifestyle benefits a party may enjoy by virtue of his/her relationship with a non-party, where there is no obligation to continue the benefits and/or where they may cease at any time. 73 Misc 3d 1134 (Sup. Ct. Kings Cty. 2021) (citing Ivani v. Ivani, 303 AD2d 639 (2d Dept. 2003); Huebscher v. [*14]Huebscher, 206 AD2d 295, 614 (1st Dept. 1994)). Under this standard, the payment of counsel fees for a litigant by a third party in divorce litigation should not be used as a vehicle to impute income to the litigant going forward. By definition, the contribution of counsel fees during the litigation is neither a continuing nor a reliable source of income upon which to base an award of child support after the litigation ceases. Accordingly, Defendant's request for an order imputing a minimum of $178,000 in income to Plaintiff on account of her parents' counsel fee payments is denied.
Termination of Defendant's Future Child Support as Unjust and Inappropriate
Defendant remains the monied spouse for child support purposes after the Court's imputation of the fair market rental value of Plaintiff's home as income to Plaintiff. Nonetheless, Defendant seeks the termination of his future child support obligations, arguing that they are unjust and inappropriate under the circumstances. Defendant submits that the payment of any child support to Plaintiff in this matter is unjust and inappropriate due to Plaintiff's "vastly superior financial resources compared to Defendant."[FN74]
Defendant's counsel supports this argument by citing to Defendant's testimony that if he is not afforded relief from his child support obligations by this Court, he will be forced to relocate from the parties' neighborhood and impose prejudice on the parties and children. This branch of Defendant's motion is denied.
In considering Defendant's argument, the Court is mindful that where children are concerned, the Court functions as parens patriae to do what is in their best interests. Here, Defendant's argument that the children would be best served by relieving him of any obligation to contribute to the payment of their expenses is at odds with his desire to be an equal parent with Plaintiff and to raise well-adjusted children. Defendant fought for parity in parenting the children, yet now seeks to disavow himself of the obligation for financial support in favor of shifting the burden to Plaintiff's parents.
While Defendant claims there is "no fat in the budget," he is not without substantial resources. Defendant is a highly educated and talented professional earning in excess of $435,000 annually. When necessary, Defendant's parents provide him with financial assistance and have established 529 accounts for the children. Despite his claims of poverty and financial peril, Defendant continues to incur discretionary expenses which, if temporarily eliminated, would cover his support obligation. It is significant that upon the Court's imputation of $156,000 in rental income to Plaintiff, Defendant's child support obligation will decrease. This Court declines to hold that Defendant's obligation to pay child support should be nullified as unjust or inappropriate either at the current rate or the reduced rate to be calculated as part of this Decision After Hearing.
Defendant next argues that all support arrears imposed by this Court upon remittitur from the Appellate Division should be vacated because Plaintiff continues to receive substantial financial support from her family. This request also is denied. At a minimum, Defendant seeks an order vacating his child support obligation as of the date of his modification motion entered on August 25, 2023, and applying all child support payments made commencing September 1, 2023, against the retroactive support arrears. Counsel argues that the Court was presented with "unequivocal evidence" that the continued payment of approximately $5,500 per month towards [*15]child support and arrears precludes Defendant from supporting his children in any meaningful way. To the contrary, the credible evidence establishes that despite Defendant's monthly payment of child support and arrears, he and the children continue to live a privileged lifestyle; they reside in the former marital residence, travel to Florida on multiple occasions each year, benefit from Defendant's membership at Rye Golf Club and participate in sports and other activities, all while Defendant is able to contribute the $30,000 annual maximum to his 401(k).
Re-calculation of Child Support
Defendant's child support obligation must be re-calculated in light of the Court's imputation of $156,000 of income to Plaintiff. The new child support award is retroactive to the date of filing of Defendant's motion for a child support modification, i.e., August 25, 2023. See DRL §236(B)(6)(a); see also Elimelech v. Elimelech, 58 AD3d 672 (2d Dept. 2009); Evans v. Evans, 57 AD3d 718 (2d Dept. 2008). "Courts have continuing jurisdiction to modify or vacate support orders until they are completely satisfied, except that they have no discretion to reduce or cancel arrears of child support which accrue before an application for downward modification of the child support obligation." Dembitzer v. Rindenow, 35 AD3d 791 (2d Dept. 2006) (quoting Hasegawa v. Hasegawa, 290 AD2d 488, 490 (2d Dept. 2002)); see Matter of Dox v. Tynon, 90 NY2d 166 (1997); Matter of Jenkins v. McKinney, 21 AD3d 558 (2d Dept. 2005); Matter of Miller v. Miller, 308 AD2d 541 (2d Dept. 2003); Howfield v. Howfield, 250 AD2d 573, 574, (2d Dept. 1998); DRL §236[B][9][b].
In calculating child support, the Court must use the formula forth in DRL § 240(B)(1-b)(b)(3)(c) (the CSSA), which sets forth a three-step method for calculating child support. Step one is the calculation of "combined parental income." Here, the parties' income was established by Defendant's 2023 year-end pay stub, and Plaintiff's last filed tax return. The second step is to multiply the combined parental income, up to a statutory cap, by a designated percentage based upon the number of children to be supported. Third, where the parental income exceeds the statutory cap, the Court must determine the amount of child support for the amount over the statutory cap through an analysis of the factors set forth in paragraph (f) of DRL § 240(1-b), and/or the child support percentage.
Plaintiff's latest tax return reveals gross business income of $71,191. To this amount, the Court adds $156,000 in imputed income for the use of Plaintiff's home, rent-free, yielding a total of $227,191. Defendant's 2023 income is $435,930.73. The combined parental income is $663,121.73. Plaintiff's pro rata share of the income after statutory deductions is 34%; Defendant's pro rata share of the income is 66%. In 2023, the statutory cap for basic child support was $163,000. Applying the formula up to the statutory cap for the parties' children yields a basic child support award payable by Defendant to Plaintiff of $31,198.20 annually, or $2,599.85 monthly for the period of August 25, 2023 to February 29, 2024. For the period from March 1, 2024, forward, the statutory cap was raised to $183,000. Applying the formula up to this cap yields a basic child support award payable by Defendant to Plaintiff of $35,026.20 annually, or $2,918.85 monthly.
The Court finds the above amounts to be just and appropriate and declines to award sums over and above the statutory cap. In reaching this determination, this Court has considered the factors listed in paragraph (f) of DRL § 240(1-b). Specifically (1) the financial resources of the custodial and non-custodial parent, and those of the children; (2) the physical and emotional [*16]health of the children; and (3) the standard of living the children would have enjoyed had the marriage or household not been dissolved. Here, each party has sufficient financial resources to meet the needs of the children when in his/her care. The children spend equal time with each party and are healthy. Accordingly, the Court finds it just and appropriate to cap the parties' income for child support purposes at the statutory amount.
Defendant shall be entitled to a credit for child support payments made prior to the issuance of this Decision After Hearing. See Markowitz v. Markowitz, 146 AD3d 872, 874 (2d Dept. 2017). Retroactive arrears of child support shall continue to be paid monthly in the sum of $2,500 until satisfied.
Accordingly, it is
ORDERED that the upon re-calculation of Defendant's child support obligation for the period from August 25, 2023, through February 29, 2024, Defendant shall pay to Plaintiff the sum of $31,198.20 annually, or $2,599.85 monthly, plus 66% of all statutory add-ons to child support; and it is further
ORDERED that upon the re-calculation of Defendant's child support obligation for the period from March 1, 2024, forward, Defendant shall pay to Plaintiff the sum of $35,026.20 annually, or $2,918.85 monthly, plus 66% of all statutory add-ons to child support; payments shall be made to Plaintiff so as to be received no later than the third of each month, commencing on June 1, 2024; and it is further
ORDERED that Defendant shall receive a credit for any overpayment of child support made prior to the issuance of this Decision After Hearing; and it is further
ORDERED that Defendant shall continue to pay child support arrears in monthly installments of $2,500 on the first of each month until such sums are paid in full; and it is further
ORDERED that Defendant's counsel shall serve a copy of this Decision and Order with notice of entry on Plaintiff within five days of the date hereof and shall file an affidavit of such service within five days thereafter.
The foregoing constitutes the Decision and Order of this Court. 
Dated: May 20, 2024
White Plains, New York
HON. ANAR RATHOD PATEL
ACTING JUSTICE OF THE SUPREME COURT

Footnotes

Footnote 1:Defendant's Order to Show Cause for a modification of child support was signed on this date.

Footnote 2:This section refers to New York's version of no-fault divorce, i.e., the irretrievable breakdown of the marriage for a period of six (6) months prior to the commencement of the action.

Footnote 3:Def.'s Mot. Seq. No. 12, signed August 25, 2023.

Footnote 4:Pl.'s cross-motion (Mot. Seq. No. 13) seeking, inter alia, enforcement of this Court's July 19, 2023, Decision and Order with respect to child support was resolved at a conference held on the record in open Court on October 17, 2023.

Footnote 5:Pl.'s Ex. 6, Form 1040.

Footnote 6:Pl.'s Ex. 22.

Footnote 7:Tr. at 167:21—24.

Footnote 8:Id. at 167:1—5.

Footnote 9:Id. at 167:6—17.

Footnote 10:Id. at 167:24—169:4.

Footnote 11:Id. at 168:8—11.

Footnote 12:Id. at 176:15—20; 178:23—25; 179:2—12.

Footnote 13:Id. at 183:25.

Footnote 14:Id. at 184:8—10

Footnote 15:Id. at 179:15—183:11; 185:18—26; 186:1—19.

Footnote 16:Id. at 179: 4—12.

Footnote 17:Id. at 192:13—25

Footnote 18:Id. at 193:6—16.

Footnote 19:Id. at 193:16—23.

Footnote 20:Id. at 195:18—197:2.

Footnote 21:Id. at 197:3—23.

Footnote 22:Id. at 197:24—198:7.

Footnote 23:Id. at 209:15—210:22.

Footnote 24:Id. at 226:6—229:13.

Footnote 25:Id. at 238:11—18.

Footnote 26:Id. at 244:4—12.

Footnote 27:Id. at 248:10—24.

Footnote 28:Id. at 249:24—250:7.

Footnote 29:Id. at 273:6—274:24.

Footnote 30:Id. at 275:2—6.

Footnote 31:Id. at 25:19—24.

Footnote 32:Id. at 21:3—23:11.

Footnote 33:Id. at 27:5—28:4.

Footnote 34:Id. at 31:8—14.

Footnote 35:Id. at 31:15-25.

Footnote 36:Id. at 32:10—33:23.

Footnote 37:Id. at 34:11—23.

Footnote 38:Id. at 36:18—37:10.

Footnote 39:$13,000 per mo. in rent x 12 mos. + $11,000 per mo. in living expenses x 12 mos. = $288,000.

Footnote 40:Tr. at 118:16—21.

Footnote 41:Id. at 120:23—124:4.

Footnote 42:Id. at 123:4—12.

Footnote 43:Id. at 46:23—47:6.

Footnote 44:Id. at 47:17—25.

Footnote 45:Id. at 49:6—25.

Footnote 46:Id. at 129:25—130:11.

Footnote 47:Id. at 52:9—53:14.

Footnote 48:Id. at 64:25—65:7.

Footnote 49:Id. at 66:19—69:19.

Footnote 50:Id. at 72:3—74:13.

Footnote 51:Id. at 79:9—24.

Footnote 52:Id. at 79:25—80:3.

Footnote 53:Id. at 82:10—13; 97:17—22.

Footnote 54:Id. at 90:14—94:2.

Footnote 55:Id. at 110:17—18.

Footnote 56:Id. at 125:18—126:19.

Footnote 57:Id. at 126:20—129:5.

Footnote 58:Id. at 131:9—134:17.

Footnote 59:Id. at 134:19—137:20.

Footnote 60:Id. at 279:11—281:17.

Footnote 61:Id. at 289:9—292:6.

Footnote 62:Id. at 292:7—294:21.

Footnote 63:Id. at 285:14—289:6.

Footnote 64:Id. at 303:3—305:3.

Footnote 65:Id. at 305:6—12, 15-23; 306:2—16.

Footnote 66:Id. at 313:13—314:6.

Footnote 67:Id. at 317:19—318:16.

Footnote 68:Id. at 101:6—18.

Footnote 69:Id. at 108:15—19; 295:8—303:2.

Footnote 70:On 1/23/24, Defendant's counsel stated on the record that Plaintiff's parents have paid in excess of $903,000 in counsel fees on her behalf.

Footnote 71:As previously noted, Plaintiff's income was reduced to $85,000 on appeal.

Footnote 72:Tr. at 94:12—16; 95:12—17.

Footnote 73:Id. at 76:3—5; 77:10.

Footnote 74:NYSCEF Doc. 321 at 11.